Your Honors, Karen Lockwood for the Labor Community Strategy Center. The class of predominantly minority transit-dependent bus riders in Los Angeles County entered a consent decree with the Metropolitan Transit Authority of Los Angeles County to reduce overcrowding of buses on existing lines, to add new additional service so they can get to jobs, schools, hospitals, other places on which they're transit-dependent to go, and to do that while containing fares, and importantly, to affix these improvements and to maintain them altogether across the system for a period of time so one does not become illusory while others are still being developed. Now the district court abandoned, essentially, this consent decree by its orders that are on appeal. I'm going to discuss the error of his order to have held that the decree was satisfied. Preliminarily, I would mention that the district court did not find that the decree was automatically terminating, and that was proper for him to find that. Instead, he retained jurisdiction over a portion of the decree. That was the second factor I mentioned, new service. But he ruled in error, as a matter of law, that the decree was satisfied, and therefore, as to the first overcrowding concern, and for that reason the entire enforcement proceedings over the overcrowding were abandoned. Why is that an issue of law? Your Honor, you're asking about whether the decree is satisfied? That is an issue of law because the first thing to look at is the test for what compliance with the decree is, and it requires that a party bound by a decree, this is the law, a party bound by a decree, actually and fully comply with every essential requirement. The question then is comply with what? And the answer to that is controlled by the specific language of the particular decree. So the answer to what is, first, what is essential here? And I've outlined the essential items. Those spring out of the four corners of the document. The second question is, in order to achieve compliance with each of those, and the one we have briefed here is the overcrowding provision, again the court looks to the four corners of the document in order to understand what compliance standard was agreed to. But is it full compliance? It is substantial compliance, which has a fudge factor in it. Yes. The question goes directly to the core of where MTA and we differ. Substantial compliance is a legal principle. This Court has recognized that. It is the best stated, perhaps, in a Tenth Circuit opinion named Officers of Justice, that that is the uniform law. As the legal doctrine, it requires that there be full actual compliance, looking to the decree's terms to determine what is to be used to measure that compliance, and that that compliance must be ticked off for every essential requirement. That's the legal standard. That is substantive compliance. We have used the term real in our brief. We have said, really, actually acknowledge the substance of this consent decree on overcrowding and fulfill it. To take the other half of your question, is substantial have a fudge factor? The answer is no, it does not. Substantial does not, in the legal doctrine, Substantial does not mean about or almost or we got close. Well, but let me ask. What about in the context of contempt? In the context of contempt, the test is a bit different. It is preceded by the concept that a person charged with contempt would raise as a defense, and that is substantial compliance as a legal doctrine is ahead of me, perhaps, but I'm going to defend against contempt, even while I'm still complying, by raising the defense that I've engaged in good faith, reasonable efforts to work toward compliance. And so if you think of it as a continuum, you can see that efforts to comply must continue throughout the enforcement proceedings until substantial compliance as the legal doctrine is achieved, full compliance. Contempt may get ticked off before that based upon a good faith and reasonable effort to get to that point. Isn't that in effect what Judge Hatter found? Judge Hatter, in his order, first dealt with the contempt issue, and then he dealt only after that with the substantial compliance issue. I think there are two things going on there that the text of his order will instruct us on. One is taking the contempt issue first, which is a distinct motion as I've established with different legal standard. He talked in that section about good faith, reasonable efforts to comply, but that is only with respect to his ruling on contempt. Our briefs demonstrate we differ with that conclusion, but let me take the point, Judge Silverman, that you ask. Once you look to the passage of his order, and it's short, that then says, now I will address the motion on my jurisdiction. What he says there is something very different. He says absolute compliance is not possible, and therefore I find that the decree has been achieved through substantial compliance. Absolute compliance is not a standard in the law. The first thing, time we have seen it, is in his order. And indeed, what it does is to let them be modified. It can be modified. If the load factors were to be found after a hearing evidence on it, due process, that was the issue. If they were found to be found to be found. This consent decree was designed for the MTA to have achieved its complying State for the first time at 4 1⁄2 years before 10 years, and then to continue it for a period of time so everything is integrated across the State. Now, was Judge Hatter with this the whole time? Judge Hatter was with it the whole time. Judge Hatter certified the class. Judge Hatter ruled with respect to the preliminary injunction. But in fact, all of the substantive work was done by the special master for the most part. That's exactly right. And it was a very, a long set of very detailed interchanges between the special master and the parties, and Judge Hatter made a couple of rulings along the way, but not very many. That's exactly right. A glance at the district court docket will demonstrate that Judge Hatter was, as you would expect, very actively managing through the class and preliminary injunction stages. When the special master was appointed, he was appointed by Judge Hatter under the consent decree, which required it. It's a mandatory dispute resolution board proceeding. And he said, I will review only. And so what he had, what he did was to have the special master who was, have the special master address at the level of detail you say. The docket then shows that Judge Hatter became again active only when the first remedial order, after MTA had violated systemically the first target date, first remedial order, Judge Hatter affirmed it and it came to this court of appeals. In the two years that the stay was in effect relating to that appeal, Judge Hatter was inactive. And then when it came back, it went almost immediately to the special master because they were now in violation of the second. It would be helpful to me if you can discuss some of the details here. Because as I understand it, as to whether we look at it in terms of substantial compliance or good faith attempts or whatever, the question is what's the target? What's the target? The target. I mean, that seems to be really where the dispute is in the sense that you're looking at the requirement of the load factor and also of the, what's called the final order with regard to the additional buses and hours and so on as substantively different. There's a dispute between the parties, I understand, about what it is they needed to do. Is that right? And that's why there's a dispute about whether they did it or almost did it. The dispute about the parties was about MTA's view that instead of moving in certain ways to meet the load factors on the target, the target load factors by the deadline and the interim deadlines, they should be allowed not to buy buses to begin with or to buy a minimum number of buses. They did buy some buses, but the dispute on the ground was let's solve this through scheduling. Let's solve this through new technology. Let's solve this through other things. And so the special master was hearing a repeated refrain of that position by MTA to say, we think we can do this in another way. That didn't work. We think we can do it in a further way. You ask about the data. It's very important to understand how that data came to be. After this panel made the first ruling in this case, then MTA compiled based upon counts of passengers, mappings, and there is an example. I'll just read it into the record at ER 413, record page 569-71. That is an example of voluminous mappings that the special master actually worked with, which show on individual bus lines how far over the target load factor the performance was actually happening. And so the load factors computed according to the consent decree based upon this court's deferments of the special master's methodology were computed throughout the period of time. And as I understand the MTA's position as to why, which they presented to Judge Hatter and which he seemed to agree with, was that as a measure of whether either substantial compliance for purposes of enforcement, meaning whether the decree should be extended or for contempt purposes in either case, that we shouldn't look at that. We should look at two other things. One of them was these numbers that they self-generated, and I must say I have a very hard time understanding what their numbers are and what your numbers are and how they compare. And second of all, as they read the special master's last order, it said, well, you don't really, if you do X, Y, and Z, X, Y, and Z, meaning buying a certain number of buses and having a certain number of service hours, we're not going to go back to the load factors. That will be good enough to do it. That's their understanding. Now, do you agree with that second reading in terms of what the order was? No, we do not. Do you want to explain why? We do not agree because the special master in the remedial order and in the draft of the remedial order wrote, I'll use the word from this Court's recognition before, meticulously fashioned remedial order that takes it all together. He said in the paragraph that MTA refers to that he, that full implementation of every piece of it would do two different things. On the first hand, it would move MTA to a demonstration if it fully implemented it. Of course, we say it didn't. It would move it to a demonstration that MTA had thereby demonstrated its good faith, reasonable effort to work toward the load factors. Meaning they weren't being contempt. Meaning they weren't being contempt. That's language of contempt. Okay. Then there is the word and, and I have a little square on it around my notes because it's a swivel point. And further, a presumption that MTA has achieved the bus procurement requirements which were intended to, as I've alluded to, to actually make a contribution to the load factors. So the argument embedded in these proceedings throughout, the Special Minister heard it repeatedly, is buy more buses because that's the big contribution to load factors. And each remedial order, he ordered a number of buses which he calculated himself based upon these detailed mappings. But was there, so is it your understanding that the expansion for bus procurement requirement was ever a substitute for actually meeting the load factor? Absolutely not. Both on the logic of it as well as on the consent decree itself. Expansion of the bus procurement factors was a requirement of MTA's adherence to the consent decree because it would help to reduce load factors. And in the decree, it's section Roman 2A3 says, to reduce load factors MTA will commit to a plan to buy buses, et cetera. No doubt that that contributes to it, and it's a critical and important contributor. In the remedial order that you have before, that the district court had before you, the one on appeal, the Special Minister also took care to explain that these buses will be deployed on the schedule required. And because there was further noncompliance with load factors even as he was writing it, that MTA shall continue very assertedly to carefully gather data, to submit it quarterly so that it could be seen what other work on load factors would have to be done once these buses came into deployment. And so I'm going to put aside and reserve on our contempt position that they never were deployed properly. You may want to reserve some time for rebuttal. Can I just ask you one question on personnel? I want to reserve three if I have it. Thank you. Yeah, you do. I don't want to concentrate on the personnel issues, but the master who left, it was that he took another job. What was the relation in time to that in what the district court held? The special master notified the parties in the district court. He took an ambassadorial position in transportation. And he notified the parties on February 21, 2006. The district court held a hearing on these motions instead of appointing another special master who could enrich the record and hear at a much more granular detailed level what the concerns were over the status of noncompliance. But the special master before he left did not have any hearings or make any findings on the status of noncompliance? There's an important point there, and thank you for cueing my focus. The special master did receive from our client the first motion to extend the enforcement of this decree, the enforcement proceedings of the decree. And the special master only about two months before that, that motion was brought on March 5 of 2004. So less than two months before that, the special master had issued the ruling that you have before you. And his response, therefore, was this is my second big remedial order. He didn't say this now. I'm going to characterize how he wrote that opinion. He said it's premature and not ripe because I've just issued a remedial order requiring them to do a number of very crisp things, and the schedule for them to get that done isn't here. And so we need to see how these buses deploy and see if we can then recognize where the load factors are going to move to. He also said a very important thing on this presumption issue, on the issue of what that presumption means, whether it supplants the consent decree. He said in the remedial order, once we get to the points, put aside the extension motion without prejudice, we'll get to that if we need to. Let's see how this works now. And if they fully deploy, then depending on the load factors, at least not until then we will reach a kind of a second stage where I can move to the remainder of the substantial compliance document. Is taking the ambassadorial position? So he issued that ruling, including what I've just reflected, on January 12, 2004. And then he resigned on February 21, 2006. In the meantime, the MTA appealed the 2004 order, the January order that you have before you, to the district court in June of 2004. And the special master subsequently said, let's see how we're going to do on the rollout of these buses and test the load factors later. So the special master never had an opportunity again to evaluate where they were before he left? That's correct. All right. We'll give you two minutes. All right. Thank you. Thank you. Good morning, Your Honors. Caroline Manky on behalf of the Los Angeles County Metropolitan Transportation Authority. The district court in this case refused to extend the consent decree beyond the 10 years set forth for the continuing jurisdiction over the decree that's in the decree itself because it found that the MTA had substantially complied with all of the essential elements of the decree, and because he found that the consent decree had served its purpose. And that's important because the plaintiff class here is focusing on a couple of very, very narrow elements of the consent decree that — Well, there are central ones, are the ones that the parties were concerned about, or at least one of two central ones, for the 10 years. And it's certainly where the disputes were for the 10 years and so on. That's correct, Your Honor. But that's also because there were innumerable other obligations under the consent decree that MTA always complied with, fully complied with, nobody disputed. I mean, you argue at some length in your brief, and this seems to me to be one of your weaker points, that because they did other things, they didn't have to do this. No. With all due respect, I think that's incorrect. The MTA has never said that it didn't have to do this. The MTA has always said that it's been doing everything within its power to comply with the load factor targets, but that it's impossible to meet an absolute level of perfection. The special master agreed with that. The district court agreed with that. And as a result, the special master — But the special master looking — using the methodology in the consent decree seemed to be repeatedly of the view that you weren't even close. I mean, you weren't anywhere near it. And MTA — and this is — I wish somebody would explain to me these competing numbers because they're confusing. But you then went and recalculated things on a different basis and said, oh, well, we are close, but I don't read the special master as ever having agreed with that. Judge Hatter may have, but one of the problems here is he didn't tell us what he thought about anything. It was such a short order that it's very difficult to evaluate. Well, let me answer that in two ways. First of all, I will come back to the issue about the numbers that you've asked about. I would be happy to explain that, how those are different and what each of those types of calculations represent. But first let me address the fact that the consent decree itself had one procedural remedy in it for alleged violations of the load factor targets, and that was to go to the special master, refer the dispute to the special master, let the special master determine the remedy. And that's exactly what happened here. No, it isn't what happened here, because the special master said, as was portrayed earlier, that we're not up to that yet. And then he resigned, and then the judge refused to appoint a second special master, even though it appeared to be absolutely clear that he was supposed to. And then nobody appealed that, so it's not before us. That's how I understand the problem. Well, actually, the special master did issue the remedial order. That's the order that is called the final order. And that was the one that was intended to establish what the obligations of the MTA were in order to establish the load factor targets. The fact that the special master never ultimately went back to the motion to extend the decree or the motion for finding the MTA in compliance with the decree does not mean that he did not. Well, let's talk about that, then. My understanding is that you bought the number of buses, he said, you, meaning your client. Correct. But did not deploy them on the peak hours, which he said you could do. Correct. That's clear. But he also, it seems to me, was pretty clear, quite clear, about the fact that the service hours were supposed to go to meeting the load factors during the peak hours, and that you didn't do. Your Honor, I don't think it is clear that it was only during peak hours. The main section of the section, let me see if I can find this, section 2, final order 2, says in order to achieve compliance with the consent decree and to meet and maintain the 1.2 LFT, you shall develop a timetable to provide the number of expansion units for the weekday a.m. peak hours and then for the weekday p.m. peak hours, how many service units. And this will require the equivalent of 40 seat buses and 425,500 additional hours. Then, while, this is in context now, while the MTA has discretion to schedule this expansion capacity on specific bus lines, et cetera, you should just deploy this additional service to meet the objective of alleviating bus overcrowding to achieve the 1.2 LFT on each and every bus line. You didn't do that. Your Honor, each and every bus line. I think if you look at the final order, which is. That is the final order. I was just reading from it. And if you look at ER page 471. Excerpts of record. Subparagraph C says nothing about peak hours. As to the purchase of the buses, you're right, but not as to the hours. And it says while the MTA retains the discretion as to how to deploy and schedule these 145 expansion buses or their vehicular equivalents throughout the bus system. Right. But all that means is you don't have to use those buses, but you do have to have the hours that matter for the load factor. He says it about four times through this. Your Honor. All he was trying to say is I'm not telling you which buses to put on which route. Correct. But this special master, as we can see, was very detailed consistently throughout the almost 10 years that he supervised the administration of this consent decree. He was very detailed. He was very thorough. If he specifically intended that these annual in-service hours had to be put onto the system. In a couple of years before, that's exactly what he said. He did not say so in subparagraph C of the last few pages of the final order, which represent the specific directions given to the MTA. What did he mean then by an additional 290,440 in light of what he just said earlier? In-service hours should be provided to meet the consent decree obligations. What did he mean by that? Correct. And he said that those could be deployed throughout the bus system. No, he didn't say that. Where did he say that? Where did he say that? I'm looking at page 471 of the excerpts of record, subparagraph C. He said that with regard to the buses. He said while the MTA retains the discretion as to how to deploy and schedule these 145 expansion buses. And then he's now he's saying something different because it was an although paragraph. That's right. An additional in-service hours should be provided to meet the consent decree obligations. And the consent decree obligations are multiple. They're not just peak periods. That does not specifically say peak periods. And this was a reasonable, good-faith interpretation of this order. And the district court so found, and the district court. Where did the district court find it? The district court found that the MTA was not in contempt of this order because MTA had employed, had deployed 290,145 additional in-service hours, had purchased and scheduled the 145 buses throughout the bus system. I mean, that's reading a lot into this extremely concise order. When he found that the MTA was not in contempt of this order, yes, he implicitly found that the MTA had complied with this specific direction because that was what was argued. And that decision is reviewed for abusive discretion. Given the Court's over 10 years, 2 years prior to the entry of the consent decree and 10 years afterwards with numerous motions for review made in front of the Court, he certainly is entitled to the deference that is given to a trial court who oversees the administration of a consent decree of this nature for an extended period of time. Can you tell us why the load factors weren't, the targets weren't able to be met? Yes, absolutely. Let me explain that. And I will explain a little bit about how those numbers work as well. The load factor targets are, they're measured by point checkers who stand out on the street and watch the buses come by for periods of time. So during any 20-minute period of time, and that's a sliding window, so it can be from 1110 to 1130 or 1111 to 1131. So any time in any sliding 20-minute period. If it's found that the average number of standing persons on a particular bus line during any 20-minute period exceeds the load factor, which is the ratio of passengers to seats, then that particular line is found to be not in compliance with the load factor targets. So for a city per month, per year. My question is why couldn't they comply? Well, I'll tell you why they couldn't comply. And that was, and let me answer your question. That was, that would be for a full quarter. It would be found to be not that line. For a quarter. Correct. So if one, in one 20-minute period, any 20-minute period there were more people standing than the load factor allowed in the whole quarter, that would not meet the load factor. Correct. For the entire quarter. And now to answer your question about why the MTA couldn't comply with the load factor The lowest load factor that it was ever required to try to meet was 1.2. But because of the vagaries of traffic, consumer demand, schools letting out, traffic accidents, any number of different things that impact the flow of traffic, the arrival of buses, the number of customers who want to get on a bus at a particular time, you can't control that. The MTA would love to be able to control it. But yet MTA agreed to this, right? And if the MTA wasn't going to do it, then didn't the MTA have to make a motion for modification? Did it ever do that? No, because it followed the orders of the special master. The special master was referred every remedial dispute, and the MTA followed every one of those orders under the interpretation that it believed was reasonable of every single one of the special master's orders. And it went far and above beyond many of the special master's orders. For example, the MTA added 545 buses to its peak fleet. It added 1.2 million hours of in-service hours annually to its bus service. It reduced the average number of riders during every in-service hour from 54 to 50. It reduced the level of capacity, the overcrowding on the buses. It implemented the Metro Rapid program, which has been tremendously successful. It sped up service. It added service. It provided better service, safer service, service that was more accessible. Do you think that if the special master had still been there, that he would have found you were in compliance? Absolutely. Absolutely. You don't think that the tone of everything he was doing all along was that you weren't? Absolutely not. I believe that the special master was doing everything he could to try to improve this bus system. That was the overarching goal of the consent decree, to improve the bus system. And that happened. But when he calculated the in-service hours that you needed to add. Correct. He was doing it based on his understanding of the decree and of the understanding that it could be, that it wasn't impossible to do it. In other words, he was using the load factor calculation as it existed in the decree, not some other calculation. Right? In a manner that he had interpreted to require. Yes. And he got those numbers from the peak period load factor figures. Correct. But you didn't put it on the peak period. That's correct. We did not read the orders regarding that. So you didn't. And even though that's how he got the numbers. You knew that was how he got the numbers. Your Honor, the BRU could have gone back to him and said, special master, we don't think the MTA is complying. They didn't do that. They moved for contempt instead. Special master never ruled on that. He would have had the opportunity to say. They also moved to extend the time of the order to enable you to comply, and he didn't rule on that either. That's correct. But, Your Honor, to go back to the question as to whether or not the special master would have found it, would have extended the decree, I absolutely think not, because of the language in that final order, which could not have been more clear, and he said full implementation of the expansion capacity requirements of this Section 2, together with the other requirements of this final order, shall constitute good faith, substantial compliance with the load factor targets of a consent decree. Yes, Your Honor. That was the January 2004 remedial order. That was January 12th. Did you comply with the Section 2 that I was reading before, which was somewhat more specific about the weekday a.m. peak hours and the weekday p.m. peak hours, the 331 expansion service and 453 expansion service units, et cetera? Did you comply with that? Well, Your Honor, I think – I'm sorry. Could you tell me what page of the extension record? 470. I'm sorry. 470. 470? I want to make sure we're looking at the same language. Your Honor, he – in that section at the bottom of page 470 that you are reading, he does talk about the 331 expansion service units. He talks about – at the top of the page 471, he's talking about 425,500 additional annual revenue hours. Right. But then he says in order to accomplish this, the MTA shall. And then he's got a series of specific things that the MTA has to do. And he's never gotten about the peak hours, and he doesn't care about them anymore. Not so – it's not that, but it's that he reduces the number of buses and in-service hours that he's ordering the MTA to deploy. Right, because you had made various arguments about different ways to do it. Correct. And he's allowing us. But that doesn't deal with the question of whether he was talking about the peak hours or whether he was going to let you – I mean, and the reason this matters, it's not just silly, as I understand it. It's because if you put the service hours in the middle of the day, then you're not affecting the load factors of the peak hours, which is what the whole dispute had been about all along. That's correct. But when he reduced all of those buses and in-service hours and gave a specific direction on how to achieve those additional service requirements, he did not specifically say that these hours had to be implemented on peak. During peak hours. He could have said that. He did not. And to say that the MTA was required to add the equivalent of 185 40-seat buses because it says it at the top of page 471 would actually defeat what he actually orders, which is in A, B, and C below that on page 471, which is – So using the consent decrees load factor method of calculation, about whether there was an improvement in load factor compliance after the 145 buses were added. I'm sorry. I didn't follow the question. What did the numbers show about whether after the 145 buses were added, there was any – using the consent decrees methodology, a higher compliance with the load factors? Your Honor, I don't have those figures directly in front of me at the moment, but they definitely showed a reduction in overcrowding. At peak hours. Absolutely. Absolutely. I don't have the specific numbers in front of me. But there was significant benefit and improvement. And then to go back to your question earlier about what the different methods that the parties have employed for calculating overcrowding and the passenger experience, as we touched on, if one 20-minute sliding window shows a load factor violation, then that one particular bus line is deemed to be in violation for the entire quarter. But what that doesn't show and what that fails to show about the true passenger experience is that for every other day of the quarter, you might have a number of empty buses driving by on that line and you'll have compliance on every other – every other time of day, every other measured period if there's just one violation. And so – Well, what that says is either you shouldn't have agreed to it the way it was written or you should have asked to change.  But there's another possibility that you're not in contempt. You may not have lived up to what you bargained for, but you may not be in contempt. Isn't that another possibility? Absolutely. Absolutely. We believe that we're significantly not in contempt. And we believe that we lived up to it. That's because contempt requires substantial compliance, not perfect compliance. Correct. And it also requires that we implemented a reasonable good-faith interpretation of the final order, which – But on that point, you were up to the Ninth Circuit and back on that issue. So as to what the contract – what the consent decree meant, we know what it meant. Correct, Your Honor. But that particular issue that was before this Court previously was specifically for the purpose of identifying exceedances that required a remedy. And the Special Master himself specifically said in one of his final orders that that particular law of the case does not apply to a remedial phase. Do you agree, by the way, that with the basic construct that was set out before, which is that the contempt standard is one thing, but the standard for extending the decree would be a different one? Well, Your Honor, in fact, in the case law – and this was a case specifically that was cited by the BRU – there's not only is there language about the fact that substantial compliance is not susceptible of a mathematically precise definition, it necessarily requires something less than 100 percent compliance, but it also indicates – and I'm speaking in particular right now about the Joseph A. v. New Mexico Department of Human Services case. That case specifically said the touchstone of the substantial compliance inquiry is whether defendants frustrated the purpose of the consent decree. For purposes of what? Purpose of a contempt or for purposes of modifying the decree to extend it? For purposes of – in this case, the Court was determining whether or not it should terminate a consent decree that did not have an express termination provision and that required a showing of substantial compliance in order to allow it to terminate, unlike here, which I think the consent decree could not be more clear that it was intended only to continue for 10 years. But the Court goes on to say that to the extent that it – But you never met the standard of the consent decree, which you agree you never did. No. I wouldn't agree that because I – because absolute perfection was impossible. The Court found that. The special master found that. And what we did is we improved the bus service. But insofar as the consent decree had a measure, you never came anywhere near it. You're saying that's – you didn't. I mean, in terms of – Not true. There were hours and hours and hours and hours and hours of time that we were fully in compliance with load factors. 94 to 99 percent of the time we were in compliance. But that's the way the consent decree was set. I mean, it's a peculiar way to set something up, but it's not the way it was set up. Because presumably because it was trying to assure – it was trying to set a ceiling. That's what it says it was doing. So it was not interested in averages. It was interested in the worst case, the way the consent decree was written. Correct. But the only way – well, the way it was interpreted. But the only way that you could never hit that ceiling in a worst-case scenario is to have so many buses that there wouldn't be room for the cars on the road. You would have to have a continual train of buses. Well, that's an argument for your going in and seeking to modify the decree. But you didn't do that. We didn't do it because the special master established remedies for – that he said we would – if we achieved, we would be in compliance with the consent decree requirements for bus procurement, and we complied with those remedies. May I ask you a kind of a practical question again on my personnel obsession this morning? Of course. This special master is gone. He had unique familiarity with the details of this case. Are there other folks, if hypothetically we should determine that maybe this ought to be looked at, are there other folks who could assume that role? Your Honor, there – to my knowledge, there is no one, no appropriate neutral who has the wealth of knowledge that special master Bliss had. No, of course not. Of course not. And I think it would be a tremendous expense and expenditure of time and resources to bring someone up to speed, because they would essentially have to read every one of special master Bliss's often 75- to 100-page orders on numerous different aspects of the decree. I thought you agreed on another special master who was his – somehow associated with Bliss. I don't remember how. We did agree to someone that Mr. Bliss had proposed replace him. We were all in agreement with that. I still think that that would have – You don't know whether that person is still around or that there are others? I assume so, but I don't know as a matter of fact. But I do expect that that person would still have to be brought up to speed tremendously. It's not, to my knowledge, somebody who was working alongside special master Bliss for the last 10 years. Thank you. You've got two minutes over, and we're going to give your adversary two minutes on the bus. Thank you, Your Honors. I would like to focus on the load factor that was agreed to and just use the word highest. The argument has been made that MTA plans to a 1.0 load factor and then things happen. The point is that this consent decree was designed for the sake of the class members and their ability to rely on this transit to establish a ceiling for what they would see coming down their roads. Again, to demystify the numbers a little bit, on pages 569 to 71, you see four tables, which each one tests the burden on – the load factors, number of people on the bus, the number of people on the bus, the number of people going westbound during peak and during off-peak. It expresses the whole experience all the way through the years. And you can see – I've got my question about whether – what the numbers show about whether once the – again, there's no dispute that the 145 buses were added. The 145 buses were not added to the service hours for the peak and the off-peak. But they were added. Okay. They were added. And that the special master definitely says is okay. He doesn't care where the buses – which particular buses were on what line. So when that happened, what did the numbers show about whether the – although the service hours were not necessarily added to the peak hours, did that affect the load factors or not? If the service hours were not directed to the peak hours – Okay. But what did the numbers show about the impact on load factors? And so the – we can only infer, based upon the knowledge I have of the record before you, that at some time after the compliance, the purchase of the buses, which would have been in the middle of 2004 plus whatever ordering time it took to deliver it, there is some diminishment, and you can see on page 30, in the noncomplying events. And at the – and then the load factors shoot up again in 2005, 2006. It is the kind of a case that makes – that makes bad policy for the judge to have said they're in substantial compliance on the standards for this decree because it represents a party who can run out the clock. That's what happened. Did you ask for an evidentiary hearing before Judge Tanner? Did you ever get one? Before Judge Hatter? You had a two-hour argument. Was that it in terms of Judge Tanner? There were – there was an argument with exhibits. Judge Hatter. Judge Hatter. There was an argument with exhibits introduced there in your record. It was an oral argument that went for about 90 minutes. And I must say that leading to that argument, Judge Hatter had already indicated that he wanted to look at the issue of continuing his jurisdiction in light of the – of our pending request. The compliance seemed to be so evident from everything the special master had been doing and from the fact that even if they bought buses, we're not there on load factors yet. So the special master was going to go back into subsequent remedial hearings in order to say, if you think – if you think there's an excuse for a noncompliant event of a load factor that's too high once you buy all these buses, you're going to have to come out and show it because the load factors are still high. Yes. You have. So we didn't expect it. You have exceeded your time. Thank you. Thank you. The case just argued is submitted. The Court appreciates the quality of argument presented by both sides this morning. We'll hear the last case on the calendar, which is Raduga Corporation versus United States Department of State.
judges: Schroeder, Silverman, Berzon